IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

NICHOLAS MORROW,

    Plaintiff

v.

METROPOLITAN GOVERNMENT OF NASHVILLE
    AND DAVIDSON COUNTY, TENNESSEE,

TOMMY WIDENER,
ANDREW KOOSHIAN,
NICHOLAS KULP,
JOHN DOE, and
RICHARD ROE

    Defendants

---

## COMPLAINT
---

The Plaintiff, Nicholas Morrow, brings hereby suit against the Defendants as follows:

## INTRODUCTION

1) This is an action for nominal, actual, and punitive damages to redress a wrongful home invasion and arrest committed by the Nashville police.

## PARTIES

2) Defendant METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE ("METRO NASHVILLE") is a municipality and political

1

subdivision of the State of Tennessee. Among other functions, it runs the Metro Nashville Police Department.

3) Defendants TOMMY WIDENER, ANDREW KOOSHIAN, NICHOLAS KULP, JOHN DOE, and RICHARD ROE are Nashville police officers. To be clear, they are being sued individually. [1]

4) Plaintiff NICHOLAS MORROW is a resident of Davidson County, Tennessee and a veteran of the United States Army Reserves.

**FACTUAL BACKGROUND**

5) Early on a Sunday afternoon, specifically April 29, 2018, Plaintiff NICHOLAS MORROW posted on his Facebook account that at 4:00 p.m. that afternoon, change was coming to Nashville.

6) He was planning to announce his candidacy as a write-in candidate for governor at the aforesaid time, and he posted the ambiguous message as something of a teaser.

7) The post also came after several other posts, which accused METRO NASHVILLE, and most notably its police department, of being corrupt.

8) Although their motivations are not fully known, two of the Plaintiff's enemies called the Metro Nashville Police. Due either to actual malice or confusion, the callers said that they had seen the Facebook posts, that MORROW was an Iraq veteran with severe PTSD, and that he *might* be planning to commit mass-murder against the students of a local community college that Sunday afternoon at 4:00.

---
1  The Plaintiff has investigated and tried to learn the real names of DOE and ROE, but so far he has been unable to get that information.

9) Had mass-murder been his plan, it would have been fairly difficult to carry out. The school does not have anyone present on Sunday afternoons.

10) The callers also noted that MORROW was delusional because he believed the Nashville government is corrupt, and that he had posted anti-police comments.

11) In response to the dubious allegation about *possible* crime on a Sunday afternoon, and in response to the Plaintiff's statements about the government's lack of integrity, the Nashville Police began a citywide manhunt for Plaintiff MORROW.

12) The whole time, MORROW was just sitting at his home alone, waiting to announce his candidacy for governor at 4:00 over Facebook.

13) Eventually, the police finally realized that MORROW might just be at his own house, and they went there to meet him.

14) At that point, numerous armed men from the Nashville Police Department surrounded and besieged MORROW's house.

15) The leaders of this campaign to trespass against the home were Captain TOMMY WIDENER, Sergeant ANDREW KOOSHIAN, and Sergeant NICHOLAS KULP.

16) In total, about twenty officers were present.

17) Initially, the police tried coming up to the front door to speak with MORROW, while simultaneously banging forcefully on his windows. MORROW was fairly certain that he had done nothing wrong and that there were no warrants out for him. Therefore, he simply denied the police entry, and declined even to answer the door.

18) The siege continued for roughly five or six hours.

19) During that time, in an effort to manufacture grounds for a warrantless arrest, the police contacted a division of the Tennessee Department of Mental Health, called Mobile Crisis Services. The police falsely told Mobile Crisis that the Plaintiff was "psychotic" and "delusional" for posting that the Nashville police were corrupt, and for posting the message about bringing in change at 4:00 on Sunday. The police requested a psychological order to arrest him.

20) Mobile Crisis Services then contacted Plaintiff MORROW by phone.

21) The Mobile Crisis representative did not explain whatsoever why the police were even present, but simply asked MORROW whether he was planning to hurt himself or others. Annoyed at the intrusion, MORROW calmly told the caller that he was not planning to hurt anyone, and that he was feeling fine. Then he ended the call.

22) Notably, no one ever accused MORROW of contemplating suicide, or of being a danger to himself.

23) No one else was present in the home except for MORROW. Nor did the police have any reason to suspect that anyone was present.

24) At no point during the five or six hours of surrounding the house did the police ever get a warrant for the Plaintiff, or for the house.

25) Instead, the police sent out statements via radio to the effect of, "Well, he didn't want to talk to Mobile Crisis, so I guess we're at an impasse." Then the warrantless siege simply continued.

26) At some point, the police walked up to the house and flipped off the air conditioner, in an effort to heat the Plaintiff up and coerce him to come outside to be arrested.

27) After five or six hours of surrounding the house and generally trespassing, finally the numerous officers pierced through the fence into MORROW's enclosed back yard, all armed with assault rifles — all except for Officer JOHN DOE, who was holding a tazer in hand and ready to fire.

28) When they came into the back yard, one of the officers began engaging in hand-to-hand combat against the Plaintiff's dog. The animal simply tried to lick the police, not understanding that they were hostile.

29) Being assaulted by the police, the dog began to cry out in pain.

30) Hearing his dog crying, MORROW stepped outside onto his back porch to see out what was going on.

31) When he stepped outside, he observed the officers in his back yard. He could see one of the officers stretching his dog's front legs at an unnatural angle, injuring the animal.

32) To end this violence, MORROW signaled for to his dog to come to him.

33) At that point, the police approached the Plaintiff to make a warrantless arrest.

34) MORROW simply told the police, "No, I've done nothing wrong," and turned around to walk back inside.

35) At that point, unidentified Officer JOHN DOE shot MORROW in the back with the tazer, unprovoked, causing him to collapse and hit the ground.

36) Next, MORROW tried to hold himself up off the ground with his arms, even after being electrocuted. Multiple officers pounced onto his back. At the same time, the unidentified Officer RICHARD ROE came by and kicked his left elbow, breaking his arm.

37) The police arrested MORROW and detained him inside a squad car for interrogation.

38) At that point, a psychologist from Mobile Crisis attempted to interview MORROW again. At that point, MORROW simply told the psychologist that the police had violated his constitutional rights by invading his home and injuring him, and that he was not interested in having a discussion. Then he invoked his right to remain silent.

39) At that point, the police took him away to a mental institution, where he was unjustly imprisoned for multiple days before ever getting a hearing.

40) All of the imprisonment was actually and proximately caused by the wrongful home invasion, assault, and arrest as described herein.

41) As a result of the police misconduct, Plaintiff MORROW suffered physical injuries and emotional distress.

42) During these events, all the police officers were acting under color of law.

43) After the Plaintiff's eventual release from custody, he repeatedly contacted the Mayor, the Chief of Police, and the Office of Professional Accountability in an effort to gain justice for this matter. The OPA investigated the incident, and concluded that all the police conduct was carried out pursuant to the procedures of METRO NASHVILLE.

# UNREASONABLE SEIZURE
## IN VIOLATION OF THE FOURTH AMENDMENT
## 42 U.S.C. 1983

### (WARRANTLESS ENTRY, EXCESSIVE FORCE, AND FALSE ARREST)

44) The paragraphs in the other sections are incorporated by reference.

45) By invading the Plaintiff's home without probable cause, without a warrant, and without exigent circumstances, and then by using excessive force against him, Officers DOE and ROE unreasonably seized the Plaintiff in violation of the Fourth Amendment and under color of law.

46) Defendants WIDENER, KOOSHIAN, and KULP are also liable for the misconduct because they directed their underlings to violate the Plaintiff's rights.

47) METRO NASHVILLE is also liable for the misconduct because the City has a widespread custom — which the Chief has expressly condoned — of sending groups of armed men to confront homeowners at their front doors late at night. This practice is normally carried out when probable cause is lacking, when it simply needs to be gleaned through intimidation via the presence of multiple officers. But even when Nashville police already possess grounds for an arrest and could simply apply for a warrant to fulfill the constitutional requirement, still they are known for making warrantless arrests, regardless of the circumstances. When the unconstitutional misconduct is brought to the attention of the higher-ups, nothing is done. Overall, METRO NASHVILLE has a widespread custom of generally ignoring the Fourth Amendment warrant requirement as it relates to arrests within a home.

48) Further, Metro Nashville is liable because its formal procedures expressly teach that "no warrant is necessary" when making an arrest based on mental health concerns.

49) Finally, through its Mayor, Chief, and OPA, METRO NASHVILLE investigated the incident in question and expressly ratified all the misconduct after the fact.

## RETALIATION FOR PROTECTED SPEECH
## IN VIOLATION OF THE FIRST AMENDMENT
## 42 U.S.C. 1983

50) The paragraphs in the other sections are incorporated by reference.

51) By laying siege to the Plaintiff's home, injuring him, telling Tennessee Mobile Crisis that he was delusional and psychotic, and then finally by arresting him, all in retaliation for his Facebook statements that Nashville was corrupt and that he was going to bring about change, Defendants DOE and ROE retaliated against the Plaintiff for his free speech, in violation of the First Amendment, and under color of law.

52) Defendants WIDNER, KOOSHIAN, and KULP are also liable for the misconduct because they directed their underlings to violate the Plaintiff's rights.

53) METRO NASHVILLE is liable for the misconduct because it fails to supervise its officers to ensure that they obey the law, and also because it investigated this particular incident and ratified all the misconduct after the fact.

## JURISDICTION

54) Federal subject-matter jurisdiction is proper because this lawsuit relies on 42 U.S.C. § 1983, and thereby involves a federal question.

8

55) Personal jurisdiction here is proper because all the Defendants are citizens of Tennessee, or else have sufficient personal contacts with this state that traditional notions of fair play do allow for jurisdiction in Tennessee.

56) Venue lies in the Middle District of Tennessee because the incident occurred there.

## **RELIEF SOUGHT**

WHEREFORE, the Plaintiff Nicholas Morrow prays for the following:

i) A jury trial,

ii) Nominal, compensatory, and punitive damages adding up to $2,000,000 — with the punitive damages being sought from everyone except Metro,

iii) The proper taxing of court costs and discretionary costs to the Defendants, and

iv) Reasonable attorney's fees, per 42 U.S.C. § 1988.

Respectfully submitted,

/s/ Drew Justice
Drew Justice BPR #29247
Attorney for Nicholas Morrow
1902 Cypress Drive
Murfreesboro, TN 37130
(615) 419-4994
drew@justicelawoffice.com